UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEONARD MACK,

               Plaintiff,

               v.

WESTCHESTER COUNTY, TOWN OF
GREENBURGH, Investigator CAROL KOPE, in her
individual capacity; Lieutenant JOHN
SCHACHINGER, in his individual capacity; ROGER
STILLMAN, as Administrator of the Estate of MARIE
FELGENHAUER; JUDY MESSINA, as
Administrator of the Estate of  Lieutenant RAPHAEL
GAROFANO; JAMES FLEMING, III, as
Administrator of the Estate of Officer JAMES
FLEMING; JACK ROE 1 as Administrator of the
Estate of Detective ROBERT WILLARD; and JACK
ROE 2 as Administrator of the Estate of Detective
GERRARD HOLLEY,

               Defendants.

---

Case No. _____

**COMPLAINT AND JURY
DEMAND**

Plaintiff Leonard Mack, by and through his attorneys Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP, alleges as follows:

## INTRODUCTION

1.      On March 29, 1976, Plaintiff Leonard Mack was wrongfully convicted of a crime he did not commit: the May 22, 1975 kidnapping at gunpoint of two teenage girls, S.F. and W.J., and the rape of S.F.[1] He was exonerated by DNA evidence in 2023 which proved the real perpetrator was serial sexual assailant Robert Goods.

---

[1] To protect their privacy, the victims are referred to by their initials.

2.     Mr. Mack's wrongful conviction, which stood for over 47 years, is the longest in U.S. history to be overturned by DNA evidence. When he was wrongly arrested and charged, he was a 23-year-old Vietnam veteran who had been honorably discharged and received the Army Commendation Medal. He was studying to obtain his GED and had a small child and a newborn. Mr. Mack was wrongly imprisoned for over 7-and-a-half years followed by approximately two-and-a-half years on parole. By the time he was exonerated, he was 72 years old and had spent over 47 years living with the stigma of a sexual assault conviction for a crime he did not commit.

3.     Mr. Mack should have never been prosecuted, let alone convicted, as his innocence was apparent from the beginning. He did not look like the true assailant Robert Goods, had no interactions with the victims, had a corroborated alibi for the time of the crime and was excluded by serological evidence as the rapist before trial.

4.     Mr. Mack was only prosecuted and convicted based on misconduct by Defendants: officers of the Westchester County Department of Public Safety,[2] officers of the Greenburgh Police Department, and Marie Felgenhauer of the Westchester County Department of Labs and Research ("Westchester County Labs").

5.     In the hours after S.F. and W.J. were attacked, the Greenburgh Police Department—which served a predominantly white community—issued a dispatch to be on the lookout for a Black male in his early 20s wearing specific clothing and accessories. A patroller began following Mr. Mack based on his identity as a Black man in his early 20s. The patroller then

---

[2] The Westchester County Department of Public Safety was created by merging the Westchester County Sheriff's Office with the Westchester County Parkway Police. Defendant Kope was an investigator with the Westchester Sheriff's Office and Defendant Fleming was an officer of the Westchester County Parkway Police.

pulled Mr. Mack over, even though his clothing did not match the description that had been provided by the victims.

6.      Through improper police suggestion, Defendants got S.F. and W.J. to misidentify Mr. Mack as the assailant—even though he was innocent and did not resemble their true assailant—and to falsely identify clothing and a distinctive gun owned by Mr. Mack as items they had seen during the assault. To make the obviously questionable identifications seem more reliable, Defendants fabricated evidence implicating Mr. Mack, including that the victims' initial descriptions more closely matched Mr. Mack.

7.      Marie Felgenhauer, the Westchester County Labs analyst, conducted conventional serological testing on the underwear collected from S.F. after the rape. This testing excluded Mr. Mack as the source of the semen left by the rapist—and should have ended the prosecution before the trial. But Felgenhauer fabricated that her serology testing demonstrated that Mr. Mack *could* have been the source of the semen in S.F.'s underwear, even though as she understood her own testing and basic principles of the field demonstrated he was definitively excluded as the source. Felgenhauer provided this fabricated serological evidence to the prosecutor and then at trial.

8.      Relying primarily on this fabricated evidence and the highly unreliable in-court identifications of Mr. Mack from W.J. and S.F., the prosecution secured his wrongful conviction on March 29, 1976.

9.      As a result of Defendants' misconduct, Mr. Mack was convicted of rape and possession of a weapon and sentenced to seven-and-a-half to fifteen years in prison.

10.    Mr. Mack has consistently maintained his innocence from the moment he was first accused through the present. He fought for years to overturn his conviction through *pro se* appeals and requests for relief, even after his release from prison and parole.

11.    Finally, with the assistance of the Innocence Project and the support of the Conviction Review Unit ("CRU") of the Office of the District Attorney for Westchester County, the remaining physical evidence from the case was submitted for DNA testing at the Westchester County Forensic Lab.

12.    In July 2023, this testing with advanced DNA technology identified a two-contributor STR-DNA mixture on the cutting from S.F.'s underwear (i.e., from the victim and the rapist). Mr. Mack was excluded as a source of this DNA. Additional Y-STR testing (which tests only male DNA) developed a single-source male profile. Mr. Mack was excluded as a source of the Y-STR profile as well.

13.    Soon after, the STR profile from the rapist was uploaded into the New York State and Local DNA Index Systems for convicted offenders. This search identified the source of the DNA as Robert Goods. Goods had been 25 at the time of the assaults, was originally from Greenburgh and had two sexual assault convictions, including one for a rape that occurred just weeks after this crime.

14.    After Goods's DNA was identified, investigators from Westchester County, the Greenburgh Police Department and the Westchester District Attorney's Office interviewed Goods. Goods admitted to being the lone perpetrator of these horrible crimes and provided accurate and specific details about the crime, corroborating his guilt.

15.    On August 28, 2023, Mr. Mack, represented by the Innocence Project, filed a motion to vacate his convictions and dismiss the indictment against him on the basis of the newly

discovered exonerating DNA evidence and actual innocence. The CRU filed an Affirmation in Support of his motion. The Westchester District Attorney's Office acknowledged that in this case "the criminal justice system failed to protect an innocent man" and apologized for the "incalculable damage and collateral consequences" in Mr. Mack's life as a result of "this grave injustice" and "absolute tragedy."

16. On September 5, 2023, the Westchester County Supreme Court granted Mr. Mack's motion, vacating his conviction and dismissing the indictment, and declared him innocent. As Judge Minihan noted in declaring Mr. Mack's absolute innocence, "[f]or close to five decades a wrongful conviction has robbed [Mr. Mack] of [his] good name and [] reputation…"

17. Mr. Mack never should have been wrongly convicted. There was never a shred of credible evidence to suggest that Mr. Mack committed the rape. Defendants fabricated all the evidence used to wrongfully convict Mr. Mack. Through this civil rights action, Mr. Mack seeks to hold Defendants accountable for their misconduct and seeks recompense for the nearly 8 years of his life he spent incarcerated as a result of his unjust conviction, the two-and-a-half years spent on parole, and the 47 years living with the stigma of a sexual offense conviction, and related damages.

## JURISDICTION AND VENUE

18. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Leonard Mack's rights as secured by the United States Constitution.

19. This Court has federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343.

20. Supplemental jurisdiction over Mr. Mack's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

21.     Mr. Mack has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the State of New York Attorney General's Office, the Westchester County Attorney's Office, and the Town Clerk of the Town of Greenburgh on December 1, 2023, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

22.     At the request of the Westchester County Attorney, Mr. Mack submitted to a hearing pursuant to New York General Municipal Law Section 50-h on June 10 and 11, 2024.

23.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York, the judicial district in which the claims arose.

## JURY DEMAND

24.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

## PARTIES

25.     Plaintiff Leonard Mack is and was at all times relevant to this Complaint a legal permanent resident of the United States, and a domiciliary and resident of the State of New York. He currently lives in South Carolina.

26.     Defendant Carol Kope was at all times relevant to this Complaint a duly appointed and acting police officer of the Westchester County Department of Public Safety, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County of Westchester.

27.     Defendant John Schachinger was at all times relevant to this Complaint a duly appointed and acting police officer of the Greenburgh Police Department, acting under color

of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Town of Greenburgh.

28.     Defendant Roger Stillman is the Administrator of the Estate of Marie Felgenhauer, who is deceased. Marie Felgenhauer was at all times relevant to this Complaint a duly appointed and acting employee of the Westchester County Department of Labs and Research, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County of Westchester. Roger Stillman, as Administrator of the Estate of Marie Felgenhauer, is sued for the acts and omissions of Marie Felgenhauer undertaken in her individual capacity. For ease of reference, Roger Stillman is referred to throughout the complaint as "Felgenhauer."

29.     Defendant James Fleming, III is the Administrator of the Estate of James Fleming, who is deceased. Marie Felgenhauer was at all times relevant to this Complaint a duly appointed and acting employee of the Westchester County Department of Public Safety, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County of Westchester. James Fleming, III, as Administrator of the Estate of James Fleming, is sued for the acts and omissions of James Fleming undertaken in her individual capacity. For ease of reference James Fleming, III is referred to throughout the complaint as "Fleming."

30.     Defendant Judy Messina is the Administrator of the Estate of Raphael Garofano, who is deceased. Raphael Garofano was at all times relevant to this Complaint a duly appointed and acting police officer of the Greenburgh Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Town of Greenburgh. Judy Messina,

7

as Administrator of the Estate of Raphael Garofano, is sued for the acts and omissions of Raphael Garofano undertaken in his individual capacity. For ease of reference, Judy Messina is referred to throughout the complaint as "Garofano."

31.    Defendant Jack Roe 1, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "Jack Roe 1," is the Administrator of the Estate of Robert Willard, who is deceased. Robert Willard was at all times relevant to this Complaint a duly appointed and acting detective of the Greenburgh Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Town of Greenburgh. Jack Roe 1, as Administrator of the Estate of Robert Willard, is sued for the acts and omissions of Robert Willard undertaken in his individual capacity.

32.    Defendant Jack Roe 2, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "Jack Roe 2," is the Administrator of the Estate of Gerrard Holley, who is deceased. Gerrard Holley was at all times relevant to this Complaint a duly appointed and acting detective of the Greenburgh Police Department, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Town of Greenburgh. Jack Roe 2, as Administrator of the Estate of Gerrard Holley, is sued for the acts and omissions of Gerrard Holley undertaken in his individual capacity.

## FACTS

### Robert Goods attacks W.J. and S.F.

33.    On the afternoon of May 22, 1975, two teenagers, S.F. and W.J., were walking home from Woodlands High School together on a path through the woods in Greenburgh, New York, when they were approached by a single assailant, Robert Goods, who was holding a

small cap gun. He walked past the two girls and then said, "Don't holler, don't scream, don't say anything, or I'll kill you." He escorted them off the path and into the woods and used S.F.'s belt and shreds of her jacket that he tore up to bind, blindfold, and gag both girls.

34.     Although they were blindfolded at times, both W.J. and S.F. had opportunities to view Goods's face during the abduction and assault.

35.     Goods removed S.F.'s clothing and raped her vaginally. He then turned to W.J. and took off her clothing. Seeing that she was menstruating, Goods put W.J.'s clothing back on, then returned to S.F. and raped her for a second time.

36.     Goods told S.F. and W.J. not to move and fled the scene. W.J. managed to untie her hands and then removed her blindfold, gag, and the bind on her feet. She began to assist S.F., but panicked and ran to a nearby campus, where a teacher saw her and called the police. After W.J. ran away, S.F. freed herself and ran home, where her sister called the police.

**Leonard Mack is Innocent.**

37.     Mr. Mack is actually innocent of the attack on W.J. and S.F. He was not present for the crimes or involved in any way and had no connection to true perpetrator Robert Goods or the victims.

38.     From the outset, and for the 47 years before his exoneration, Mr. Mack always maintained his innocence. He also reported a consistent alibi, which was corroborated by several witnesses.

39.     In 2023, post-conviction DNA testing jointly arranged by the Westchester County DA CRU and the Innocence Project excluded Mr. Mack as the source of the semen left by the rapist on victim S.F's underwear.

40.     This DNA testing further identified serial sexual assailant Robert Goods as the source of the DNA on S.F.'s underwear. Goods was originally from Greenburgh and had been 25 at the time of the assaults in 1975. He was convicted of a burglary and rape in Queens that occurred just weeks after S.F.'s rape; he also had a 2004 conviction for the burglary and the sexual assault of a woman in Greenburgh.

41.     Further investigation by the CRU confirmed Goods's guilt and Mr. Mack's innocence. Upon questioning, Goods confessed to committing the crime alone, volunteering to investigators specific details about the crime that only the true assailant would know.

42.     The District Attorney joined Mr. Mack's motion to vacate his conviction and stated that he was an "innocent man… who was wrongfully convicted and incarcerated" and apologized for this "absolute tragedy."

43.     On September 5, 2023, the Westchester County Supreme Court vacated Mr. Mack's conviction and dismissed the indictment on the basis of his actual innocence, finding that Mr. Mack is "factually" and "absolutely innocent" of these crimes.

**W.J. and S.F. give descriptions that do not match Mr. Mack.**

44.     The abduction and assault of W.J. and S.F. was investigated by Defendants Investigator Carol Kope and Officer James Fleming of the Westchester County Department of Public Safety ("WCDPS"), along with Lieutenants John Schachinger and Raphael Garofano, and Detectives Gerard Holley and Robert Willard of the Greenburgh Police Department ("GPD").

45.     Garofano, Holley, and Kope obtained descriptions of the assailant from W.J. and S.F. on the day of the attack.

46.     Garofano and Holley met W.J. at the Woodlands High School campus and took her to the crime scene, where they found W.J.'s hat, shoes, and schoolbooks, and shreds of

S.F.'s jacket. W.J. provided a description of the attacker to the police which was eventually included in the dispatch description.

47.     Kope interviewed S.F. at the Grasslands Hospital where she was being examined. A rape kit was collected from S.F. and her underwear was collected as well.

48.     Kope and Holley reported that S.F. and W.J. collectively described the attacker as a young Black man, wearing a large black hat (possibly with a white band), a tan jacket, and dark colored pants, with a gold earring in his ear. The attacker was also reported to have a black gun.

49.     Notably, there was no description of any kind of shirt and the pants are not referred to by color, just as dark. The gun was simply described as "small" and "black."

**Mr. Mack is pulled over because he is Black, despite not otherwise matching the description of the attacker.**

50.     Consistent with the description provided by the victims at this point, at approximately 4:40 p.m. the GPD issued a dispatch to be on the lookout for a Black male in his early 20s, wearing black pants, a tan jacket, a black hat with a white brim, a gold earring in left ear, and small black handgun.

51.     About two hours after the attack, Defendant Fleming of the WCDPS, who had heard the GPD dispatch alert, saw Mr. Mack driving down the Bronx River Parkway. Observing that he was a Black male in his early 20s, he began following Mr. Mack. Fleming pulled Mr. Mack over on the Bronx River Parkway, telling him he fit the description of a rape suspect. Notably, Mr. Mack was wearing clothing that did not match the dispatch description, including a yellow sleeveless tank top and blue checkered pants.

52.     Mr. Mack told Fleming truthfully that he did not rape anyone and that he had spent the afternoon with his girlfriend and had just dropped her off at home.

53.     In the rear seat of the car Fleming saw a distinctive green multi-colored knit shirt. Mr. Mack was not wearing a tan jacket, nor was one found in his car.

54.     Fleming searched Mr. Mack's vehicle and found a .22 caliber, black-and-white revolver in the trunk. Fleming took possession of the gun and arrested Mr. Mack for gun possession. Both Fleming and Defendant Schachinger questioned Mr. Mack while he was under arrest.

**Defendants use improper suggestion during an unwarranted roadside identification procedure.**

55.     Although Fleming had already arrested Mr. Mack at approximately 6 p.m. for gun possession, he kept him at the roadside to conduct an unjustified and suggestive roadside identification procedure.

56.     Defendant Holley of the GPD directed Defendant Willard of the GPD to take W.J. to the Bronx River Parkway to view Mr. Mack in a one-person show-up procedure, which is known to be highly suggestive.

57.     By the time W.J. arrived at the scene, Fleming had possession of the black-and–white revolver found in Mr. Mack's trunk and the green, multi-colored knit shirt found in his backseat.

58.     By the time of the roadside identification, W.J. had not given a description to police of any shirt that her attacker was wearing and had only described the gun as small and black.

59.     In addition to the suggestion inherent in any one-person show-up, Defendants, including Willard and Fleming, with Schachinger present at the scene, used additional undisclosed suggestion to induce W.J. to identify Mr. Mack as her assailant, including representing

to W.J. that the circumstances under which he was stopped and his possession of a gun demonstrated that he was the assailant.

60.     However, Mr. Mack did not look like true assailant Robert Goods. Nor was he wearing clothing that looked at all like what Goods had worn during the attack. Without Defendants Fleming and Willard's improper suggestion W.J. would never have misidentified Mr. Mack as her assailant.

61.     Despite this suggestion, when W.J. was first shown Mr. Mack, she did not identify him as her attacker. W.J. was then taken to view Mr. Mack a second time.

62.     During her interactions with Defendants on that day, Defendants showed W.J. the distinctive green multi-colored knit shirt and the black and white gun retrieved from Mr. Mack's car.

63.     Holley later reported that W.J. had positively identified Mr. Mack during a fairly conducted roadside identification procedure. This representation was false. Defendants, including Holley, misrepresented the circumstances of this identification procedure to make it appear more reliable, including by hiding the improper suggestion they had used with W.J.

**While Mr. Mack is in police custody, Defendants continue to fabricate evidence to falsely implicate Mr. Mack, including through improper suggestion.**

64.     Throughout the evening following Mr. Mack's arrest, the police conducted a series of highly suggestive identification procedures with S.F. and W.J. designed to induce them to identify Mr. Mack as their attacker.

65.     Although Fleming and Willard claimed that W.J. had already positively identified Mr. Mack during the roadside identification, Defendants continued to conduct suggestive identification procedures with her that evening.

66.     After his arrest, Mr. Mack's photo was taken at the WCDPS headquarters in the presence of Garofano, Holley, and Willard and placed in a photo array at the GPD.

67.     Defendant Kope showed an improperly suggestive photo array to both S.F. and W.J. Mr. Mack noticeably stood out from the other photos as he was the only person clearly wearing an identifiable shirt—the green, multi-colored knit shirt Fleming had seized from Mr. Mack's car and shown W.J.—in the photograph and was the only one posed in front of a May 1975 calendar. Despite this suggestion (but consistent with his innocence) S.F. did not identify Mr. Mack as the assailant. Defendants reported that W.J. identified Mr. Mack (whom she had already seen during the roadside identification) from the photo array.

68.     Garofano, Holley, Willard, and Kope then returned to the WCDPS headquarters with W.J. and S.F. to conduct yet another improperly suggestive identification procedure: a one-person show-up procedure through a one-way mirror. Mr. Mack was the only suspect viewed, surrounded by officers; he was also the only Black person in the room. And according to Defendants, W.J. had already positively identified Mr. Mack twice that day—once at the roadside show up, and once from a photo taken that day. Nevertheless, when they were initially shown Mr. Mack in person at WCDPS headquarters, neither S.F. nor W.J. positively identified him as the assailant.

69.     To compound the suggestion, Defendants had Mr. Mack change his clothing to put on the green, multi-colored knit shirt and the brown pants. Despite Defendants' extensive suggestion (but consistent with his innocence), S.F. *never* made a visual identification of Mr. Mack as the assailant. Defendants reported that W.J. positively identified Mr. Mack from this show-up procedure.

70.     Minutes later, Defendants had Mr. Mack speak the words that were used in the commission of the attack. Defendants reported that S.F. positively identified Mr. Mack's voice as that of her attacker.

71.     Defendants Holley, Kope, Garofano, and Willard misrepresented the circumstances of these identification procedures to bolster the ultimate identifications, including by failing to accurately report the full extent of the suggestion they used. It was only as a result of Defendants' improper suggestion that W.J. and S.F. ever wrongly identified the innocent Mr. Mack as their assailant.

72.     Defendants also fabricated additional evidence falsely implicating Mr. Mack. Defendants, including Fleming, used improper suggestion to get W.J. and S.F. to misidentify specific clothing found in Mr. Mack's car (including the distinctive green, multi-colored knit shirt) as the clothing worn by the assailant. Defendants, including Fleming, used improper suggestion to alter W.J.'s description of the gun used by the assailant to a two-toned, black-and-white gun—matching the gun seized from Mr. Mack. Defendants misrepresented the circumstances of these reports, hiding their improper suggestion, to make them seem falsely inculpatory.

73.     That same evening, Mr. Mack was interrogated for hours by GPD including Fleming and Holley under the command of Garofano. Mr. Mack repeatedly and truthfully told Defendants that he was innocent and did not know anything about the crimes. Mr. Mack provided an alibi to another WCDPS officer at the scene, stating that he was driving with his girlfriend Dorothea Davis after school and dropped her off at her home in Ossining, New York.

**The prosecution of Mr. Mack goes forward based on Defendants' fabrications.**

74. The sole evidence implicating Mr. Mack was the product of Defendants' unconstitutional misconduct. Based on evidence Defendants fabricated and their misrepresentations, Mr. Mack was wrongly prosecuted.

**Forensic testing conclusively excludes Mr. Mack as the perpetrator before trial.**

75. Shortly after the prosecution began, Defendant Felgenhauer of the Westchester County Labs conducted conventional serology testing on evidence collected from S.F.

76. Prior to the advent of forensic DNA testing in the late 1980's, the criminal justice system relied on conventional serology in sexual assault cases to either corroborate an eyewitness identification of a suspect (and strengthen the prosecution's case) or to demonstrate that the eyewitness made a misidentification of the suspect, resulting in the dismissal of the charges and a resumption of the criminal investigation. Crime labs routinely examined the blood type and secretor status of the victim and the suspect and compared them to the blood group substances recovered in the rape kit and from underwear worn by the victim in an effort to include or exclude the suspect as the source of the recovered semen.

77. There are four major ABO blood types: A, B, AB and O. Approximately 80% of the human population secretes their ABO blood group substances (A, B, and H) in their non-blood bodily fluids (e.g. their saliva and semen or vaginal secretions); they are called secretors. The remaining 20%, who do not secrete these blood group substances into non-blood bodily fluids, are called non-secretors. An A secretor would secrete A plus H blood-group substances; B secretors would secrete B and H blood-group substances; an AB secretor would secrete A, B and H substances; and an O secretor would only secrete H substances. It is a basic tenet of forensic biology—and one that was unanimously accepted by the forensic community by the time the crime occurred in the instant case—that if a person is a secretor, they will secrete their

ABO substances in *all* of their bodily fluids and if they are a non-secretor, their ABO substances will be absent from *all* their bodily fluids. Saliva was thus universally selected in all sexual assault cases to determine the secretor status of the victims, assailants and potential suspects and was the basis for excluding or including a potential suspect.

78.    ABO blood typing is not nearly as discriminating as DNA testing for including a suspect—it cannot identify a particular donor, to the exclusion of the world's population. For instance, approximately 9% of the population is a blood-type B secretor. If forensic testing demonstrated that the semen recovered from the rape evidence was deposited by a B secretor, and the suspect was also a type-B secretor, then the suspect would be included in the 9% of the population of potential donors. On the other hand, this conventional serology can definitively *exclude* a suspect. If the semen on the rape kit comes from a B secretor and the suspect is an A or O secretor, then that suspect would be definitively excluded as the source of the semen.

79.    Conventional serology as was done in this case was typically conducted on biological stains in the underwear worn by the victim after the rape, which was presumed to be a mixed stain—a combination of vaginal fluids from the victim and semen deposited by the rapist. And if, as in this case, the victim had not had sex within the previous 72 hours, that confirmed that the semen detected in the mixed stain came from the rapist. The Westchester County Labs found substantial amounts of acid phosphatase (the universally accepted presumptive test for semen) in an extract taken from a small piece of the stained material from S.F.'s underwear, demonstrating the presence of semen on the underwear.

80.    Serology testing was subsequently conducted by Defendant Felgenhauer of the Westchester County Labs to determine the ABO blood type and secretor status of S.F. and Mr. Mack and to compare those results to any blood group substances identified on the stain from the

underwear. Felgenhauer tested S.F.'s blood and determined she was blood type A. The test of her saliva revealed that no blood group substances were present in her saliva which meant that S.F. was a member of the 20% of the population that are non-secretors. Felgenhauer issued a report concluding that S.F. was a non-secretor. The finding of "non-secretor" meant that the blood group substances A and H would never be present in her vaginal fluids or saliva. By 1970 and to this day, it was a fundamental scientific fact that an individual is either a secretor or a non-secretor in *all* their non-blood bodily fluids, that is to say people cannot secrete in one bodily fluid and not secrete in the others.

81.     Felgenhauer tested the mixed stain from the underwear and identified A and H blood group substances. Since she already knew that S.F. was a non-secretor, the A and H substances must have been deposited by the rapist, who thus had to be an A secretor.

82.     Finally, Felgenhauer tested Mr. Mack. The blood test revealed he was type O and the saliva test identified H blood group substances, as would be expected from an O secretor.

83.     Felgenhauer knew prior to Mr. Mack's trial that he was scientifically excluded as the source of the semen left by the rapist and that he could not have been the rapist of S.F. Had she communicated the truth to the prosecutor, the charges against Mr. Mack would have been dismissed before trial.

84.     Instead of informing the Assistant District Attorney that Mr. Mack was definitively excluded as the source of the semen in S.F.'s underwear, Felgenhauer fabricated false evidence which she shared with the prosecutor in support of continuing the prosecution. Felgenhauer fabricated that the serology testing demonstrated that Mr. Mack *could* have been the source of the semen in S.F.'s underwear, even though as she understood her own testing and basic principles of the field demonstrated he was definitively excluded as the source.

**The suggestive identification procedures are bolstered by Defendants' misrepresentation that W.J. independently and voluntarily described the items found in Mr. Mack's car.**

85.    Mr. Mack moved to suppress the identifications of him and a suppression hearing was held hours before the trial on March 15, 1976.

86.    The court ruled that both the photo array and the in-person show-up conducted through the one-way mirror at the WCDPS headquarters were unnecessarily suggestive and any identifications from those procedures would be excluded. However, the court permitted W.J. to identify Mr. Mack in court based on Defendants' misrepresentations regarding the circumstances of the roadside identification and the description W.J. had initially provided of the perpetrator. If Defendants had accurately represented what had occurred, the entire identification would have been suppressed and the prosecution ended.

87.    The court also ruled that S.F.'s voice identification was unnecessarily suggestive; that identification, too, was excluded.

**Mr. Mack is wrongly convicted based on misrepresentations, fabrications, and false forensic testimony.**

88.    Mr. Mack was tried beginning on March 15, 1976.

89.    The prosecution's case centered on W.J.'s in-court identification of Mr. Mack, as well as the fabricated description of the rapist's clothes and gun which matched the items seized from Mr. Mack. Defendants misrepresented the circumstances of the identification to falsely make it appear more reliable. They also misrepresented that W.J. and S.F. had independently described items matching what Mack owned, when in reality they only did so as a result of Defendants' undisclosed and improper suggestion.

90.    At trial, Mr. Mack presented his alibi through his own testimony and that of three other witnesses. Mr. Mack had spent the afternoon with his girlfriend. First, he picked her and two of her friends up at school and dropped the friends off at their homes. Mr. Mack and his

girlfriend, Davis, then spent time at Rochambeau High School, where Mr. Mack was earning his G.E.D., and stopped by the mechanic shop next to the school where they consulted with two mechanics, Brown and Sims, about an issue Mr. Mack was having with his car's headlights. Mr. Mack then dropped his girlfriend off at home at approximately 4:30 to 5:00 p.m. Davis, Brown, and Sims corroborated Mr. Mack's account.

91.    Mr. Mack also introduced testimony from Dr. Alexander Wiener—a renowned leader in the field of serology—explaining that the biological material recovered from S.F.'s underwear had to have come from her attacker, and that Mr. Mack was excluded as the source because of his blood type. The prosecution put Felgenhauer on the stand as a rebuttal witness, who repeated the fabricated evidence that her serology testing demonstrated that Mr. Mack *could* have been the source of the semen found. The prosecution relied on this fabricated evidence to rebut Mr. Mack's accurate defense that he was forensically excluded as the source of the semen.

92.    Despite the abundant evidence of his innocence, based on the false evidence Defendants obtained implicating him, and without knowledge of the exculpatory information Defendants suppressed, Mr. Mack was wrongly convicted by a jury of rape in the first degree and two counts of possession of a weapon in the second degree on March 29, 1976.

93.    On May 7, 1976, Mr. Mack was sentenced to seven-and-a-half to fifteen years in prison.

**After over four and a half decades of living with a wrongful conviction, post-conviction proceedings unearth new evidence proving Mr. Mack's innocence.**

94.    For over four and a half decades, Mr. Mack never stopped proclaiming his innocence. He filed multiple *pro se* motions and appeals. After spending seven-and-a-half years wrongly imprisoned, on December 13, 1982, Mr. Mack was released on parole. He spent an

additional two-and-a-half years on parole. In total he lived with the daily horror and practical impediments of a conviction for a rape that he did not commit for over four-and-a-half decades before the truth finally came out. Eventually, Mr. Mack gained the assistance of the Innocence Project in seeking to finally clear his name.

95.     On June 7, 2023, pursuant to a request from CRU and the Innocence Project, Westchester Labs conducted Short Tandem Repeat ("STR") DNA testing, which had been unavailable at the time of trial, on the cuttings of S.F.'s underwear, as well as an analysis of a buccal swab collected from Mr. Mack.

96.     The STR-DNA testing of the stain from S.F.'s underwear cutting yielded a mixture. Probabilistic genotyping analysis revealed that the mixture could be attributed to two sources—S.F. and the perpetrator. Mr. Mack was excluded as a source of this mixture. A single Y-STR, or male, profile was also obtained from the cutting. Mr. Mack was excluded as the source of the male DNA profile.

97.     The DNA profile obtained from the cutting from S.F.'s underwear was uploaded into New York's State ("SDIS") and Local DNA Index Systems ("LDIS") and on August 3, 2023, Mr. Mack was notified that Robert Goods was a match. Further investigation by the CRU confirmed that Goods was the sole perpetrator of these crimes and that Mr. Mack was actually innocent.

98.     Based on this newly uncovered DNA evidence which corroborated what Mr. Mack had been proclaiming for the last 47 years and what the serological evidence showed even before trial, Mr. Mack filed a motion to vacate his conviction on August 28, 2023. The CRU filed an Affirmation in Support of his motion.

99.    On September 5, 2023, the Supreme Court of New York, Westchester County vacated the conviction against Mr. Mack on the grounds of newly discovered evidence, newly discovered DNA evidence, and actual innocence and dismissed the indictment.

100.    In all, Mr. Mack spent 7 years, 6 months, and 21 days incarcerated for a crime he did not commit. He then spent the next 47 years living under the cloud of stigma and shame from his conviction.

## DAMAGES

101.    The unlawful actions of Defendants caused Mr. Mack to spend more than seven and a half years in prison for crimes he did not commit.

102.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Mack sustained injuries and damages, including but not limited to the following: loss of freedom; pain and suffering; physical injuries; the worsening of injuries and health conditions due to inadequate medical care; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

103.    As a direct result of his unjust conviction and imprisonment, many of the effects of these harms continue to this day and will continue into the future.

**FEDERAL CLAIMS**

**First Claim for Relief**
**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence under the Fourteenth Amendment**
**(Defendants Fleming, Kope, Holley, Willard, Garofano, Schachinger and Felgenhauer)**

104.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 103 above as if fully set forth here.

105.    Defendant officers Fleming, Kope, Holley, Willard, Garofano, and Schachinger, and analyst Felgenhauer fabricated false evidence of Mr. Mack's guilt, thereby violating his right to a fair trial and causing him to be deprived of his liberty without due process of law. Defendants caused this false evidence to be used against Mr. Mack in his prosecution and at trial.

106.    Defendants Fleming, Kope, Holley, Willard, Garofano, and Schachinger fabricated inculpatory information when they induced W.J. and S.F. to falsely identify Mr. Mack by engaging in unduly suggestive identification procedures and direct suggestion to W.J. and S.F. about Mr. Mack matching the attacker's description.

107.    In addition, Defendants Fleming, Kope, Holley, Willard, Garofano, and Schachinger suppressed evidence of their misconduct. Defendants failed to disclose the true circumstances of the roadside identification, including the improper suggestion Defendants used to induce W.J. and S.F. to falsely identify Mr. Mack as the perpetrator.

108.    Defendant Felgenhauer fabricated a completely false conclusion from the serological testing, which led the prosecutor to pursue the case against Mr. Mack. In addition, Felgenhauer repeated this misrepresentation and suppressed the exculpatory forensic evidence at trial, which led to Mr. Mack's conviction.

109.    Had Defendants disclosed the exculpatory information regarding W.J. and S.F.'s identification of Mr. Mack and the results of the serology testing, Mr. Mack would have never been prosecuted or convicted for a crime he did not commit.

110.    Defendants performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Mack's constitutional rights and innocence. No reasonable officer in 1975 would have believed this conduct was lawful.

111.    Mr. Mack is completely innocent of the kidnapping of W.J. and S.F. at gun point and the rape of S.F. The prosecution finally terminated in Mr. Mack's favor on September 5, 2023, when the conviction was vacated and the indictment dismissed.

112.    As a direct and proximate cause of Defendants' actions, Mr. Mack was indicted, tried, wrongly convicted and imprisoned for almost 8 years and suffered the other grievous damages and injuries set forth above.

## Second Claim for Relief
### 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Malicious Prosecution
### (Defendants Fleming, Kope, Holley, Willard, Garofano, Schachinger, and Felgenhauer)

113.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 103 above as if fully set forth here.

114.    Defendant officers Fleming, Kope, Holley, Willard, Garofano, and Schachinger, and analyst Felgenhauer with malice and knowing that probable cause did not exist to arrest Mr. Mack and prosecute him for the kidnapping of S.F. and W.J. at gunpoint and the rape of S.F., acting individually and in concert, caused Mr. Mack to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Mack's clearly established right, under the Fourth and

Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

115.    Specifically, Defendant officers Fleming, Kope, Holley, Willard, Garofano, and Schachinger, and analyst Felgenhauer, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Mr. Mack, including but not limited to the fact that W.J. and S.F's statements and identification of Mr. Mack were fabricated by the officer Defendants and were the product of improper and unduly suggestive identification procedures, and that Mr. Mack was excluded by serological testing. Defendants intentionally withheld this exculpatory information from the prosecutor. The information Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Mack.

116.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Mack's clearly established constitutional rights. No reasonable officer in 1975 would have believed this conduct was lawful.

117.    Mr. Mack is completely innocent of the kidnapping of W.J. and S.F. at gun point and the rape of S.F. The prosecution finally terminated in Mr. Mack's favor on September 5, 2023, when the conviction was vacated and the indictment was dismissed.

118.    As a direct and proximate cause of Defendants' actions, Mr. Mack was indicted, tried, wrongly convicted and imprisoned for almost 8 years and suffered the other grievous damages and injuries set forth above.

**<u>Third Claim for Relief</u>**
**42 U.S.C. § 1983 Civil Rights Conspiracy**
**(Defendants Fleming, Kope, Holley, Willard, Garofano, Schachinger, and Felgenhauer)**

119.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 103 above as if fully set forth here.

120.    Defendant officers Fleming, Kope, Holley, Willard, Garofano, and Schachinger, and analyst Felgenhauer, acting within the scope of their employment and under color of state law, agreed among themselves and other individuals to act in concert in order to deprive Mr. Mack of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial and fair pretrial proceedings.

121.    In furtherance of the conspiracy Defendants engaged in and facilitated numerous overt acts including, without limitation, the following:

(a)    fabricating inculpatory evidence, including the purported independent identification Mr. Mack by W.J. and S.F. and the false interpretation of the forensic testing;

(b)    wrongfully arresting and causing the conviction and incarceration of Mr. Mack, knowing that they lacked probable cause;

(c)    committing perjury during hearings and trials;

(d)    intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* material during the pendency of the case;

(e)    thereafter suppressing and covering up evidence of their wrongdoing in all of the foregoing respects for a long period of time, while Mr. Mack remained in prison for a crime they knew he did not commit.

26

122.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Mack's clearly established constitutional rights. No reasonable officer in 1975 would have believed this conduct was lawful.

123.    Mr. Mack is completely innocent of the kidnapping of W.J. and S.F. at gunpoint and the rape of S.F. The prosecution finally terminated in Mr. Mack's favor on September 5, 2023, when the conviction was vacated and the indictment was dismissed.

124.    As a direct and proximate cause of Defendants' actions, Mr. Mack was indicted, tried, wrongly convicted and imprisoned for almost 8 years and suffered the other grievous damages and injuries set forth above.

### STATE LAW CLAIMS

#### Fourth Claim for Relief
#### Malicious Prosecution
#### (Defendants Fleming, Kope, Holley, Willard, Garofano, Schachinger, and Felgenhauer)

125.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 103 above as if fully set forth here.

126.    Defendant officers Fleming, Kope, Holley, Willard, Garofano, and Schachinger and analyst Felgenhauer with malice and knowing that probable cause did not exist to arrest Mr. Mack and prosecute him for the kidnapping of S.F. and W.J. at gunpoint and the rape of S.F., acting individually and in concert, caused Mr. Mack to be arrested, charged, and prosecuted for that crime.

127.    Specifically, Defendant officers Fleming, Kope, Holley, Willard, Garofano, and Schachinger, and analyst Felgenhauer, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Mr. Mack, including but not limited to the fact that W.J. and S.F's statements and

identification of Mr. Mack were fabricated by the officer Defendants and were the product of improper and unduly suggestive identification procedures. Defendants intentionally withheld this exculpatory information from the prosecutor. The information Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Mack.

128.    Mr. Mack is completely innocent of the kidnapping of W.J. and S.F. at gunpoint and the rape of S.F. The prosecution finally terminated in Mr. Mack's favor on September 5, 2023, when the conviction was vacated and the indictment was dismissed.

129.    Defendants engaged in these acts withing the scope of their employment.

130.    Mr. Mack is completely innocent of the kidnapping of W.J. and S.F. at gunpoint and the rape of S.F. The prosecution finally terminated in Mr. Mack's favor on September 5, 2023, when the conviction was vacated and the indictment was dismissed.

131.    As a direct and proximate cause of Defendants' actions, Mr. Mack was indicted, tried, wrongly convicted and imprisoned for almost 8 years and suffered the other grievous damages and injuries set forth above.

## <u>Fifth Claim for Relief</u>
**Intentional, Reckless, or Negligent Infliction of Emotional Distress**
**(Defendants Fleming, Kope, Holley, Willard, Garofano, Schachinger, and Felgenhauer)**

132.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 103 above as if fully set forth here.

133.    The improper, deliberate, and traumatizing conduct of Defendant officers Fleming, Kope, Holley, Willard, Garofano, and Schachinger, and analyst Felgenhauer, as well as their conduct in deliberately causing, or recklessly disregarding the risk of causing, the wrongful prosecution, conviction, incarceration, and concomitant severe emotional distress, was extreme

and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

134.    In the alternative, Defendant officers Fleming, Kope, Holley, Willard, Garofano, and Schachinger, and analyst Felgenhauer, negligently and grossly negligently, and in breach of their duties owed to Mr. Mack to, *inter alia*, report accurately the information given by witnesses and the circumstances underlying such statements; refrain from conducting unduly suggestive identification procedures and report accurately what occurred during identification procedures; refrain from fabricating evidence and withholding material exculpatory and impeachment evidence, and otherwise acting to deny Mr. Mack due process of law, directly and proximately caused Mr. Mack, who was innocent, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than seven and a half years. Defendants' actions unreasonably endangered Mr. Mack's physical and mental health and safety, and caused him to suffer physical harm, including physical ailments resulting from the circumstances and, duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pre-trial and post-conviction incarceration.

135.    Defendants engaged in these acts withing the scope of their employment.

136.    Mr. Mack is completely innocent of the kidnapping of W.J. and S.F. at gunpoint and the rape of S.F. The prosecution finally terminated in Mr. Mack's favor on September 5, 2023, when the conviction was vacated and the indictment was dismissed.

137.    These claims are tolled as Defendants concealed from Mr. Mack—and still are concealing to this day—their conduct giving rise to this cause of action.

### Sixth Claim for Relief
### *Respondeat Superior*
### (Defendant Westchester County)

138.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 103 above as if fully set forth here.

139.    At all times relevant to this Complaint, Defendant officers Fleming, Kope, and analyst Felgenhauer, acted as agents of Westchester County, in furtherance of the business, including law enforcement functions, of Westchester County, and within the scope of their employment or agency with Westchester County.

140.    The conduct by which the Defendant officers Fleming, Kope, and analyst Felgenhauer committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the Defendants' personal motives, but rather was undertaken while the Defendants were on duty, carrying out their routine investigative functions as detectives and police officers and when conducting their routine analysis as a forensic analyst.

141.    Mr. Mack is completely innocent of the kidnapping of W.J. and S.F. at gunpoint and the rape of S.F. The prosecution finally terminated in Mr. Mack's favor on September 5, 2023, when the conviction was vacated and the indictment was dismissed.

142.    Under the doctrine of *respondeat superior*, Westchester County is liable for their agents' state law torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence.

**Seventh Claim for Relief**
*Respondeat Superior*
**(Defendant Town of Greenburgh)**

143.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 103 above as if fully set forth here.

144.    At all times relevant to this Complaint, Defendant officers Holley, Willard, Garofano, and Schachinger acted as agents of the Town of Greenburgh, in furtherance of the business, including law enforcement functions, of the Town of Greenburgh, and within the scope of their employment or agency with the Town of Greenburgh.

145.    The conduct by which the Defendant officers Holley, Willard, Garofano, and Schachinger committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the Defendants' personal motives, but rather was undertaken while the Defendants were on duty, carrying out their routine investigative functions as detectives and police officers.

146.    Mr. Mack is completely innocent of the kidnapping of W.J. and S.F. at gunpoint and the rape of S.F. The prosecution finally terminated in Mr. Mack's favor on September 5, 2023, when the conviction was vacated and the indictment was dismissed.

147.    Under the doctrine of *respondeat superior*, the Town of Greenburgh is liable for their agents' state law torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby requests judgment against Defendant as follows:

(a)    That the Court award compensatory damages to Plaintiff and against the Defendants, jointly and severally, in an amount to be determined at trial;

(b)    For a trial by jury;

(c)    For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(d)    For any all other relief to which the Plaintiff may be entitled.

Dated: New York, New York
        November 25, 2024

Respectfully submitted,

/S/Emma Freudenberger
Emma Freudenberger
Anna Benvenutti Hoffmann
Amelia Green
Elsa Mota

NEUFELD SCHECK BRUSTIN HOFFMANN
& FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, New York 10014
(212) 965-9081
Emma@nsbhf.com

*Counsel for Plaintiff Leonard Mack*